UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ANNA PACHECO,

                 Plaintiff,

       -v-

COMPREHENSIVE PHARMACY SERVICES, et al.,

                 Defendants.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 1 9 2013

12 Civ. 1606 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

      This case arises from Plaintiff Anna Pacheco's employment by Defendant Comprehensive Pharmacy Services ("CPS"). In addition to CPS, Plaintiff brings claims against her former supervisor, Reid Toda. Plaintiff alleges that Defendants discriminated against her on the basis of her national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 295, *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. Plaintiff also alleges retaliation in violation of Title VII, NYSHRL, and NYCHRL; and gender and gender-plus discrimination and harassment in violation of NYSHRL and NYCHRL.

      Defendants filed this motion for summary judgment on January 2, 2013. Dkt. No. 40. For the reasons that follow, the motion is granted in its entirety.

## I. LEGAL STANDARD

      "Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, 'there is no genuine issue as to any material fact' and 'the moving party is entitled to a judgment as a matter of law.'" *Anyanwu v. City of New York,*

No. 10-cv-8498, 2013 WL 5193990, at *1 (S.D.N.Y. Sept. 16, 2013) (quoting Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).  For purposes of summary judgment, there is a genuine issue of material fact if a reasonable factfinder could decide in the non-moving party's favor. *Nabisco*, 220 F.3d at 45.

The burden is generally on the moving party to demonstrate that there is no genuine issue of any material fact. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994).  When the burden of proof at trial would fall on the non-moving party, however, the moving party may meet its burden by "point[ing] to a lack of evidence. . . on an essential element" of the non-moving party's claim.  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

If the moving party shows that there is no genuine issue of material fact, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  In doing so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (citations omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); and *FDIC v. Great Am. Ins. Co.,* 607 F.3d 288, 292 (2d Cir. 2010)).

## II. BACKGROUND

Unless otherwise indicated, the following facts are undisputed or taken the in light most favorable to Plaintiff.

2

Plaintiff is a woman of Dominican national origin. Def. 56.1 Statement ¶ 4; Am. Compl., Gorman Decl., Ex. A, ¶ 7, at 3. She is a licensed pharmacist in New York. Def. 56.1 Statement ¶ 4; Gorman Decl., Ex. C, at 12-1.

Defendant CPS is an independent pharmacy services provider that manages pharmacies throughout the United States and Puerto Rico on a contractual basis. Def. 56.1 Statement ¶ 1; Am. Compl., Gorman Decl., Ex. A, ¶ 9, at 3. In or around September 2008, CPS was hired to manage the pharmacy at the New York State Psychiatric Institute ("NYSPI"), and on October 8, 2008, Plaintiff was hired by Edward Fingers, CPS's Regional Director of Operations, and David Lowenthal, the Clinical Director of NYSPI, to be the Director of Pharmacy at NYSPI. Def. 56.1 Statement ¶¶ 3-4; Gorman Decl., Ex. F, at 10, 12; Gorman Decl., Ex. E, at 20, 30. At the time Plaintiff was hired, Mr. Fingers was her direct supervisor at CPS, and Dr. Lowenthal was Plaintiff's on-site supervisor at NYSPI. Def. 56.1 Statement ¶ 5; Gorman Decl., Ex. C, at 45-46; Gorman Decl., Ex. F, at 56-57.

As Director of Pharmacy at NYSPI, Plaintiff's job duties included supervising and evaluating staff pharmacists. Def. 56.1 Statement ¶ 6; Gorman Decl., Ex. C., at 42, 44. As of June 2009, the staff pharmacists included Sandra Takami (an Asian woman of Japanese national origin), Juana Costigan (a Hispanic woman of Dominican national origin), Michael Ahimari (an African American man), Siam Wright (an African American woman), Rosa Basas (a woman of Cuban national origin), Elsa Correa (a Hispanic woman of Dominican national origin); and Pelaggia Skalvounos (a woman of Columbian and Greek national origin). Def. 56.1 Statement ¶ 8; Gorman Decl., Ex. C., at 54-56. At some later point, Robert Jung, a man of Korean national origin, joined the staff at NYSPI. *See* Def. 56.1 Statement ¶ 21(5).

3

In June 2009, while Plaintiff was on vacation, staff pharmacists held a meeting with Dr. Lowenthal to complain about Plaintiff's performance as manager. Def. 56.1 Statement ¶ 9; Gorman Decl., Ex. C, at 66. At the meeting, the staff complained that Plaintiff spoke negatively about staff pharmacists behind their backs, and that Plaintiff was not helpful. *See* Def. 56.1 Statement ¶ 9; Gorman Decl., Ex. F, at 43-45; Ex. C, at 69. Dr. Lowenthal told Plaintiff about the meeting and the complaints when she returned from vacation. Gorman Decl., Ex. C, at 69. Plaintiff does not dispute that the meeting took place, but she does object that the assertions regarding the content of the staff complaints are hearsay. Pl. 56.1 Statement ¶ 9(b), at 2-3.

In November 2009, Mr. Fingers gave Plaintiff 3.4 out of 5 on her annual performance review, where 3 indicated "Proficient" and 4 indicated "Exceeds Standards." Def. 56.1 Statement ¶ 10; Gorman Decl., Ex. O. Plaintiff received scores of "4" for "[p]romot[ing] teamwork among staff, peers, physicians, and others" and "[p]romot[ing] multidisciplinary teamwork in order to meet the organization's goals and standards." Pl. 56.1 Statement ¶ 10(b); Gorman Decl., Ex. O. In the comments section, it was noted that Plaintiff should "[c]ontinue to work on the improvement of services to the customers (patients, nursing staff, administration) by implementing programs and maintaining good relationships with the pharmacy and hospital staff and administration." Def. 56.1 Statement ¶ 10; Gorman Decl., Ex. O. Mr. Fingers described Plaintiff's overall score of 3.4 as a "good score," Pl. 56.1 Statement ¶ 10; Borelli Decl., Ex. B, at 46, and this score should have qualified Plaintiff for a raise, which she did not receive, Pl. 56.1 Statement ¶ 10; Borelli Decl., Ex. C, at 78-79.

Plaintiff became pregnant in May 2010, and she informed her staff and supervisors shortly thereafter. Def. 56.1 Statement ¶ 11; Gorman Decl., Ex. C, at 79-84. Defendant Toda, who was at that time Regional Director of Behavioral Health at CPS, learned of Plaintiff's

4

pregnancy when he visited NYSPI in June or July 2010. Pl. 56.1 Statement ¶ 11; Gorman Decl.,

Ex. D, at 83. This was the second time Plaintiff met Defendant Toda. Def. 56.1 Statement ¶ 11;

Gorman Decl., Ex. C., at 79.

In July 2010, Plaintiff, Dr. Lowenthal, and Mr. Fingers discussed overstaffing issues at

NYSPI, ultimately deciding to reserve the issue for future resolution. Def. 56.1 Statement ¶ 12;

Gorman Decl., Ex. C., at 97-100. Despite instructions to keep these discussions confidential,

Plaintiff discussed the overstaffing issue with Janelle Greenhill, an administrator at the non-party

Research Foundation and Mental Health, suggesting the pharmacy was overstaffed by one

person. Pl. 56.1 Statement ¶ 12; Borelli Decl., Ex. D, at 97-98. On July 10, 2010, Mr. Fingers

issued Plaintiff a letter of reprimand for circumventing her chain of command by discussing the

overstaffing issues with Janelle Greenhill. Def. 56.1 Statement ¶ 13; Gorman Decl, Ex. C, at 97-

100; Ex. I. In her response to the letter of reprimand, Plaintiff admitted that she had spoken with

Ms. Greenhill, but maintained "that the contents of [her] actions were [not] wrong" because she

felt the recommendation related to her duties as Pharmacy Director. Pl. 56.1 Statement ¶ 13(d);

Gorman Decl., Ex. P.

In October 2010, Mr. Fingers gave Plaintiff 2.6 out of 5 on her second annual

performance evaluation, where a score of "2" indicated "below standards" performance. Def.

56.1 Statement ¶ 15; Pl. 56.1 Statement ¶ 15 (disputing only the characterization of the

performance evaluation as a "further deterioration"); Gorman Decl., Ex. Q. In the employer

comments section, Mr. Fingers indicated that Plaintiff's "goals for the next evaluation period"

included "leading by example gaining the respect of other pharmacy members and other hospital

departments," and Plaintiff was warned that failure to improve "could lead to further disciplinary

action." Def. 56.1 Statement ¶ 15; Gorman Decl., Ex. Q.

5

Plaintiff submitted her request to begin her maternity leave on December 20 or 22 in October 2010. Pl. 56.1 Statement ¶ 16(a); Borelli Decl., Ex. D, at 131. In November, Mr. Fingers expressed dismay when he learned that Plaintiff would be going on leave earlier than she anticipated, and Plaintiff was forced to use her vacation days to accommodate her early delivery. Pl. 56.1 Statement ¶ 16(b)-(c); Borelli Decl., Ex. D, at 130, 137. Plaintiff delivered her baby on December 23, 2010, and she returned to work between March 14 and March 16, 2011, Pl. 56.1 after taking her full twelve weeks of FMLA leave and approximately one week of accumulated paid time off. Def. 56.1 Statement ¶ 16; Pl. 56.1 Statement ¶ 16(c) Gorman Decl., Ex. C, at 145; Borelli Decl., Ex. D, at 138.

Defendant Toda became Plaintiff's immediate supervisor in March 2011. Def. 56.1 Statement ¶ 17; Gorman Decl., Ex. C, at 173. Plaintiff had not seen Defendant Toda since June 2010, and she did not communicate with him at all during her pregnancy leave. *Id.* During the time that he was Plaintiff's direct supervisor, Defendant Toda visited the NYSPI pharmacy approximately five or six times. *See* Def. 56.1 Statement ¶ 21; Pl. 56.1 Statement ¶ 21 ("Undisputed."). Plaintiff felt that Defendant Toda respected staff pharmacists Sandra Takami and Robert Jung, who are both, like Defendant Toda, of Asian descent, more than he respected her. Def. 56.1 Statement ¶ 21; Gorman Decl., Ex. C, at 199-200, 202. Defendant Toda allegedly called Plaintiff "cocky," referred to her work as mediocre, and "spoke to her like she was a dog and/or child." Def. 56.1 Statement ¶ 21; Gorman Decl., Ex. C, at 188, 192, 195. On one or two occasions, Defendant Toda mistook Plaintiff for Puerto Rican; when corrected, he responded, "Oh that's right, you are not Puerto Rican, *they* are very nice people." Pl. Opp. 5; Borelli Decl., Ex. E, at 189.

6

In July 2011, Defendant Toda was prompted to visit NYSPI after two dispensing errors were made by Ms. Takami, a female staff pharmacist of Japanese national origin supervised by Plaintiff. Def. 56.1 Statement ¶ 17; Gorman Decl., Ex. D, at 132-33, 155. Following these errors, the entire pharmacy staff was counseled about dispensing errors and made to follow new procedures. Pl. 56.1 Statement ¶ 18; Borelli Decl., Ex. F, at 164-65. Defendant Toda initially attributed the errors to "the system" and Plaintiff's management, and he was reluctant to blame Ms. Takami. Pl. Opp. 5; Borelli Decl., Ex. C, at 179. In the end, however, Defendant Toda was persuaded to issue Ms. Takami an "Employee Warning Notice" for the errors. Pl. Opp. 5; Gorman Decl., Ex. I.

On August 11, 2011, Ms. Takami resigned from her position as staff pharmacist in a brief email sent to Mr. Fingers, Defendant Toda, and Plaintiff. Def. 56.1 Statement ¶ 23; Gorman Decl., Ex. W. In addition to offering her resignation, Ms. Takami's email mentioned that she had informed Defendant Toda of her intention to resign the day before. Pl. Opp. 5; Gorman Decl., Ex. W. Later on August 11, 2011, Dr. Lowenthal replied to Ms. Takami's email to express surprise at "the manner in which [she was] resigning" and observe that she was "in effect leaving without any notice." Def. 56.1 Statement ¶ 23; Gorman Decl., Ex. X. He suggested that either "something [had] happened recently that was disturbing to [Ms. Takami]," or "[she] had in fact been looking [for a new job] and found something and [was] pressed to start right away." *Id.*

Ms. Takami responded to Dr. Lowenthal's suggestions on August 14, 2011, explaining that she was leaving because she felt "very uncomfortable at the pharmacy." Def. 56.1 Statement ¶ 24; Gorman Decl., Ex. X; *see also* Pl. 56.1 Statement ¶ 24 (not disputing the contents of the email). The bulk of Ms. Takami's complaints concerned Plaintiff, whom she

7

characterized as suffering from "paranoia and [the] belief that everyone is out to get her." Gorman Decl., Ex. X. According to Ms. Takami's email, Plaintiff sowed discord within the pharmacy by badmouthing staff members, shifting around blame for staff mistakes, and spreading malicious rumors. *Id.* Ms. Takami, for example, noted that Plaintiff was suspicious of her relationship with Defendant Toda and Robert Jung, because "we are all Asian, and [Defendant Toda] happens to get along with us." *Id.* Ultimately, Ms. Takami claimed that Plaintiff's management left her feeling as if she were "walking on a tightrope with no support." *Id.* Ms. Takami, however, also emphasized that her problems with Plaintiff were "not regarding [Plaintiff's] work capabilities." *Id.*

Later that same day, August 11, 2011, Defendant Toda forwarded the email containing Ms. Takami's complaints to Karen Clawson and Stephanie Wesala in the CPS Human Resources Department. Def. 56.1 Statement ¶ 25; Gorman Decl., Ex. X. In his email, Defendant Toda wrote, "This is very disturbing. Please advise next steps with Anna." Gorman Decl., Ex. X. CPS Human Resources officer Stephanie Wesala responded to Toda's email by initiating an investigation of Plaintiff on August 15, 2011, and placing Plaintiff on administrative leave the same day. Pl. 56.1 Statement ¶ 26 (stating that the human resources investigation was prompted by Toda's email); Def. 56.1 Statement ¶ 26; Gorman Decl., Ex. C, at 206; Ex. J, at 88, 90; Ex. N.

On August 16, 2011, Plaintiff emailed CPS Human Resources to file a complaint of national origin-based discrimination against Defendant Toda. Def. 56.1 Statement ¶ 27; Gorman Decl., Ex. AA; Ex. C. at 222-23; Ex. J, at 112. In the same email, Plaintiff notified CPS Human Resources of her intention to file discrimination complaints with New York State and New York City as well. Defendant 56.1 Statement ¶ 27; Gorman Decl., Ex. AA. On August 22, 2011,

Plaintiff filed a complaint of national origin discrimination with the New York State Division of Human Rights ("NYSDHR").[1]  Gorman Decl., Ex. HH.

CPS retained a local attorney named David Tango to separately investigate Plaintiff's discrimination claims.  Def. 56.1 Statement ¶ 27; Gorman Decl., Ex. C at 229.  Plaintiff, however, expressed doubt that she would be able to  participate in Mr. Tango's investigation because she was not sure whether she was permitted to while her NYSDHR complaint was pending.  Pl. 56.1 Statement ¶ 27(e); Borelli Decl., Ex. C, at 136-37.  Unlike Plaintiff, Defendant Toda was not placed on administrative leave during the pendency of the investigation against him.  Pl. 56.1 Statement ¶ 26(b).

Meanwhile, Ms. Wesala in CPS Human Resources continued her investigation into Ms. Takami's complaint.  In the course of that investigation, Ms. Wesala interviewed nine individuals who were managed by Plaintiff.  Def. 56.1 Statement ¶ 28.  According to the report that was prepared, those interviews revealed "definite examples of instances of not only. . . harassing but discriminatory treatment" by Plaintiff.  Def. 56.1 Statement ¶ 29; Gorman Decl., Ex.  J, at 117; Gorman Decl., Ex. GG.  The resulting investigative report found that Plaintiff "[was] guilty of making disparaging comments about employees," Def. 56.1 Statement ¶ 29; Gorman Decl., Ex. GG.  Two of the interviewed employees told investigators that Plaintiff's conduct had improved since the June 2009 meeting with Dr. Lowenthal.  Gorman Decl., Ex. GG. The remaining employees, however, reported that Plaintiff "ma[de] a lot of remarks," for

---

[1] There is some confusion in the record regarding the agency with which the August 24, 2011, discrimination complaint was filed.  *See* Pl. 56.1 Statement ¶ 27(c) (stating that Plaintiff filed a complaint with the NYCCHR). *But see* Gorman Decl., Exh. C, at 253 (stating that Plaintiff had filed a complaint with the NYSDHR); Exh. HH (Verified Complaint filed by Plaintiff with NYSDHR).  The Court assumes that the relevant complaint was filed in the NYSDHR, but also notes that, wherever the complaint was filed, it constituted protected activity for purposes of retaliation under Title VII, NYSHRL, and NYCHRL.

example calling Ms. Takami a "dumb blonde" and "ditzy," describing another employee as "Spongebob because her shape is square," and referring to staff pharmacists by their ethnicities. *Id.* Plaintiff denies making these statements, but she does not deny that CPS received numerous reports that she made such statements. *See* Pl. 56.1 Statement ¶ 29 (denying that she made such statements, but not denying that the statements were reported to the investigator).

On August 18, 2011, Ms. Wesala provided written copies of her initial investigative report to Plaintiff, asked Plaintiff to respond to the claims, and informed Plaintiff that she would remain on administrative leave until the investigation was completed. Def. 56.1 Statement ¶ 31; Gorman Decl., Ex. CC. The initial report detailed evidence that Plaintiff "[t]alk[ed] about employees behind their backs," "[t]r[ied] to get employees into trouble," created an "[u]ncomfortable workplace," engaged in "[m]alicious behavior," and generally failed to "interact with the staff" on the pharmacy floor. Gorman Decl., Ex. CC. Plaintiff did not deny that employees had previously complained about her talking about them behind their backs, but rather emphasized that the meeting was held with Dr. Lowenthal, her on-site supervisor at NYSPI, and not her supervisor at CPS. *Id.* Plaintiff, however, expressed incredulity at the allegation that she "[t]r[ied] to get employees into trouble" and claimed to be "dumbfounded" by the allegation that she created an uncomfortable workplace. *Id.* As an example of her helpfulness, Plaintiff recalled an incident in which one staff pharmacist called her to complain "that she was not getting any work to do because [another pharmacist] was taking it all." *Id.* She also defended herself by explaining that, far from the uncomfortable environment described in the report, she had always "tr[ied] to create a familial environment" at the pharmacy, such as by setting up a collection drive to enable a staff pharmacist to travel to the Dominican Republic for a family funeral, and by hosting a lavish catered holiday party for staff out of her own pocket.

10

*Id.* She concluded: "it is very hard to believe that the staff that went to visit my son at the hospital and at home when he had surgery was the same staff that said the frivolous comments mentioned in the investigation." *Id.*

On August 28, 2011, Dr. Lowenthal, who was Plaintiff's on-site supervisor at NYSPI, also responded to Ms. Wesala's initial investigative report with his own observations about Plaintiff's conduct as manager. *See* Def. 56.1 Statement ¶ 32; Gorman Decl., Ex. DD. The email recounted the June 2009 meeting at which the staff pharmacists complained about Plaintiff's "[t]alking about employees behind their back," as well as the incident in which Plaintiff circumvented the chain of command to recommend reducing the pharmacy staff. Gorman Decl., Ex. DD. Dr. Lowenthal described Plaintiff as "ha[ving] done a good job in certain areas, and in [his] opinion, a poor job in others," notably "interpersonal and supervisory skills." *Id.* In particular, Dr. Lowenthal expressed "strong doubt that [Plaintiff would] be able to improve" her interpersonal skills and indicated that "[his] own strong feeling [was] that [Plaintiff] [would] not be an effective head of [NYSPI's] Pharmacy going forward." *Id.* In other words, NYSPI informed CPS that it did not want Plaintiff back as manager of their pharmacy, and bringing Plaintiff back to work as Director of Pharmacy at NYPSI would have required CPS to "stake[] their reputation on it." Pl. 56.1 Statement ¶ 34.

Ms. Wesala completed her investigation of Ms. Takami's allegations against Plaintiff on September 2, 2011. Def. 56.1 Statement ¶ 33; Gorman Decl., Ex. GG. Meanwhile, Mr. Tango completed his independent investigation of Plaintiff's complaint that Defendant Toda had discriminated against her, delivering his report to Ms. Wesala on September 27, 2011. Def. 56.1 Statement ¶ 35; Gorman Decl., Ex. J, at 120-21. Ms. Wesala testified that Mr. Tango's investigation not only exonerated Defendant Toda, but actually uncovered further evidence of

11

discriminatory and harassing conduct by Plaintiff.  Def. 56.1 Statement ¶ 35; Gorman Decl., Ex. J, at 142, 147; *see also* Pl. 56.1 Statement ¶ 35 (objecting that this is hearsay but not disputing the assertion).

Ms. Wesala initially believed that Plaintiff's misconduct might be remedied through coaching and counseling, consistent with the CPS Corrective Action Policy.  Pl. 56.1 Statement ¶ 33; Borelli Decl., Ex. C, at 119.  That policy provides: "[w]hen an employee's actions are inappropriate for our work environment, interfere with performance, violate Company policy, or job performance is below standards, the Company may decide, in its sole discretion, to use progressive discipline designed to help the employee improve job performance and/or ensure full and immediate correction of inappropriate behavior."  Gorman Decl., Ex. N, at 3.  The policy contemplates the following forms of discipline, from least to most severe: verbal warning, written warning, final written warning, and termination.  *Id.*  The policy also provides that "[m]anagers shall consult with an HR Manager when an employee's performance. . . may warrant an investigation," and that, "[i]f the situation or circumstance warrants, an employee may be placed on administrative leave during an investigation."  *Id.*

At some point after learning of NYSPI's opposition to Plaintiff and receiving the results of Mr. Tango's investigation of Plaintiff's complaint against Defendant Toda, Ms. Weseala changed her mind and decided to recommend that Plaintiff be removed from her position as Director of Pharmacy.  *See* Pl. 56.1 Statement ¶¶ 30 (Ms. Wesala's decision was based on Mr. Tango's investigation), 38 (Ms. Wesala's decision was based on Dr. Lowenthal's opposition).  On September 28, 2011, Plaintiff was offered the option of either resigning or being terminated.  Def. 56.1 Statement ¶ 38; Gorman Decl., Ex. J, at 117, 121; Ex. C, at 247.  Plaintiff refused to resign and was terminated.  Pl. 56.1 Statement ¶ 38(d); Borelli Decl., Ex. C, at 126.  Following

Plaintiff's departure from CPS, Robert Jung was promoted to be Director of Pharmacy at NYSPI in her place.  Def. 56.1 Statement ¶ 39; Gorman Decl., Ex. F, at 101.

## III. DISCRIMINATION CLAIMS

### A. Individual liability under Title VII.

Before proceeding to analyze the merits of Plaintiff's claims against Defendants, the Court notes that individuals are not subject to liability under Title VII. *See Anyanwu*, 2013 WL 5193990, at *9; *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).  Individual Defendant Toda is therefore entitled to summary judgment on the Title VII claims against him. NYSHRL and NYCHRL discrimination claims, by contrast, may be brought against individual defendants. *See Anyanwu*, 2013 WL 5193990, at *10 (citing *Alexander v. Westbury Union Free Sch. Dist.*, 829 F.Supp.2d 89, 113 (E.D.N.Y.2011)).  The Court will consider the individual liability of Defendant Toda under the NYSHRL and NYCHRL after it determines whether those claims survive summary judgment as against CPS.

### B. Hearsay

Plaintiff objects that various statements asserting that pharmacy staff complained about her interpersonal skills constitute inadmissible hearsay. *See, e.g.* Pl. 56.1 Statement ¶¶ 9, 29, 36. Plaintiff, for example, objects to Dr. Lowenthal's statements asserting that pharmacy staff complained to him about Plaintiff talking about them behind their backs, saying negative and malicious things, and being unhelpful. *See* Pl. 56.1 Statement ¶ 9.  Although the statements to which Plaintiff objects are indeed out-of-court statements, "[o]ut-of-court statements are not hearsay if offered to show the context within which parties were acting, or to show a party's motive or intent for behavior." *Arista Records LLC v. Lime Group LLC* , 784 F. Supp. 2d 398, 420-21 (S.D.N.Y. 2011) (citing 6 Weinstein's Federal Evidence, § 801.11[5]).  Thus, to the

extent that such statements are offered to demonstrate Defendant's motive in investigating and eventually terminating Plaintiff, and not to prove that Plaintiff actually made such remarks, they constitute admissible non-hearsay and can be considered by the Court.

### C. National origin discrimination

#### 1. Legal standard

Plaintiff alleges that she was discriminated against on the basis of her national origin in violation of Title VII, NYSHRL, and NYCHRL.  The Court analyzes these claims under the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 216-17 (2d Cir. 2005) (analyzing Title VII, NYSHRL, and NYCHRL under the *McDonnell* framework).  Under that framework, it is initially a plaintiff's burden to establish a *prima facie* case of intentional discrimination.  Although the precise elements of this *prima facie* claim may vary depending on the factual circumstances involved, *see McDonnell Douglas*, 411 U.S. at 802 n.13, a plaintiff may ordinarily meet her burden by showing: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  At summary judgment, a plaintiff's initial burden is "minimal." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

If a plaintiff successfully establishes a *prima facie* case of intentional discrimination, a presumption of unlawful discrimination arises, and the burden shifts to the defendant to "come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions

14

toward the plaintiff." *Mandell v. Cnty. Of Suffolk*, 316 F.3d at 380; *see also McDonnell Douglas*, 411 U.S. at 802.

Once both parties have satisfied their initial burdens, "the plaintiff's ultimate burden of persuasion is the burden she bore from the outset—to persuade the trier of fact that she was the subject of illegal discrimination." *Holtz v. Rockefeller & Co., Inc*, 258 F.3d 62, 81 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000); *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). A plaintiff may accomplish this "by showing that the defendant's proffered reasons were pretextual or were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Anyanwu*, 2013 WL 5193990, at *11 (citing *Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 455 (S.D.N.Y. 2012) (internal quotation marks omitted)).

### 2. Placement on administrative leave

Plaintiff alleges that she was unlawfully discriminated against on the basis of national origin when CPS placed her on administrative leave following a complaint by staff pharmacist Sandra Takami. Am. Compl., Gorman Decl., Ex. A ¶¶ 41, 51, at 8, 10; Pl. Opp. 9. In order to establish a *prima facie* case of unlawful discrimination and meet her burden under the first step of *McDonnell Douglas*, Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action when she was placed on administrative leave; and (4) that adverse action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d at 138 (2d Cir. 2003). Defendants do not contest that Plaintiff is able to satisfy the first three elements of the test. *See* Def. Br. 6-8. This leaves only the question of whether Plaintiff's placement on administrative leave occurred under circumstances giving rise to an inference of discrimination.

15

"In general, an inference of discrimination may be drawn from various circumstances, including direct evidence of 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group.'" *Anyanwu*, 2013 WL 5193990, at *10 (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (citations omitted)).   Because "[d]irect evidence of discrimination, 'a smoking gun,' is typically unavailable" in the employment discrimination context, a plaintiff may also rely on indirect, circumstantial evidence to prove her case. *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

### i. Instigation of complaint

Plaintiff argues that the events leading up to the adverse employment action, her placement on administrative leave, give rise to an inference of discriminatory intent.  Pl. Opp. 9. Specifically, Plaintiff argues that Defendant Toda, who is of Japanese national origin, and whom Plaintiff alleges to harbor national-origin based animus, "encouraged" Ms. Takami, who is also of Japanese national origin, "to make allegations against Plaintiff as a pretense for his discriminatory treatment of Plaintiff."  Pl. Opp. 9-10.

The record, however, reveals no evidence that Defendant Toda "encouraged" Ms. Takami to make her complaint.  As Plaintiff concedes and the record plainly shows, it was not Defendant Toda but Dr. Lowenthal who prompted Ms. Takami to explain her reasons for resigning, and it was not national origin-based bias, but concern about staffing the pharmacy on short notice, which motivated his inquiry.  *See* Pl. 56.1 Statement ¶ 24 ("The August 14, 2011 e-mail written by Takami [containing her complaint about Plaintiff], is *the response that she wrote to Lowenthal's further inquiry* as to why she decided to resign so abruptly before a replacement was found.").  Even viewing the evidence in the light most favorable to Plaintiff, the allegation

16

that Defendant Toda forwarded Ms. Takami's complaint to human resources *after* it had already been elicited by Dr. Lowenthal offers no support for Plaintiff's argument that Defendant Toda "encouraged" Ms. Takami to act as she did, and no reasonable factfinder could find that it raises an inference of discrimination.  Def. 56.1 Statement ¶ 25 (indicating that Defendant Toda forwarded Ms. Takami's email to human services); Pl. 56.1 Statement ¶ 25 ("Undisputed for purposes of this motion.").

Nor does the fact that Ms. Takami apparently informed Defendant Toda of her intention to resign the day before informing Plaintiff and Dr. Lowenthal raise any inference of discrimination.  Nothing in the record permits the inference that Defendant Toda encouraged Ms. Takami to make any allegations against Plaintiff in this prior conversation, and the Court will not speculate that any such encouragement took place. *See Brown*, 654 F.3d at 358 (non-moving party "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment) (internal citation omitted).  Indeed, Ms. Takami did not make any allegations against Plaintiff after discussing her intent to resign with Defendant Toda.  As discussed, it was only after *Dr. Lowenthal* inquired that Ms. Takami's complaints surfaced.

Accordingly, the sequence of events leading up to Plaintiff's placement on administrative leave does not raise an inference of discrimination.

### ii. Rudeness

Plaintiff also argues that an inference of discrimination may be drawn from the allegations that "Defendant Toda was frequently rude to [her]."  Pl. Opp. 10.  At the outset, the allegations that Defendant Toda referred to Plaintiff as "[c]ocky," spoke to Plaintiff "in a condescending manner," ordered Plaintiff to sit down "as if he were expressing a command to a dog," and was generally "rude" bear no relation to Plaintiff's national origin and raise no

17

inference of discrimination. *Cf. Ford v. New York City Dep't of Health and Mental Hygiene*, 545 F. Supp. 2d 377, 389 (S.D.N.Y. 2008) (finding that "abusive comments—like 'fat fish' and 'stupid fish'" provided no evidence of gender-based discrimination). Such "rude and unprofessional" conduct "merely indicates personal enmity rather than discrimination." *Wilson v. Family Dollar Stores of New York, Inc.*, No. 06-cv-639, 2008 WL 4426957, at \*8 (E.D.N.Y. Sept. 25, 2008).

Only one of Defendant Toda's alleged derogatory statements actually invokes Plaintiff's national origin. In June or July of 2011, Defendant Toda allegedly mistook Plaintiff's national origin as Puerto Rican "once or twice" and implied that people of her national origin, Dominican, were not "very nice." Def. 56.1 Statement ¶ 21; Am. Compl.,Gorman Decl., Ex. A, ¶¶ 34-37, at 7. Specifically, Plaintiff alleges that, when she informed Defendant Toda that she was Dominican and not Puerto Rican, he responded, "[O]h, that's right, you are not Puerto Rican, *they* are very nice people." Am. Compl., Gorman Decl., Ex. A, ¶¶ 34-37, at 7 (emphasis in original).

When determining the significance of this kind of "isolated and stray remark," courts examine the context in which the remark occurred, paying particular attention to the strength of the relationship between the remark and the alleged adverse action. *Campbell v. Alliance Nat. Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding a single racially discriminatory remark made by a non-decisionmaker one year before the adverse action insufficient to generate an inference of discrimination). Under this rubric, the significance of the remarks is immediately undercut by the extremely limited role Defendant Toda played in the decision to place Plaintiff on administrative leave. Even reading the record in the light most favorable to Plaintiff, Defendant Toda at most "instigated" the investigation of Plaintiff by forwarding Ms. Takami's

18

complaint to CPS Human Resources—nothing in the record indicates that he encouraged or

otherwise participated in the decision to place Plaintiff on leave during the investigation of that

complaint.

But even if Defendant Toda had played a role in the decision to place Plaintiff on

administrative leave, the derogatory statements are too isolated, remote, and benign to give rise

to an inference of discrimination.  The derogatory statements regarding Plaintiff's national origin

were made only "once or twice" in the one or two months immediately preceding the challenged

adverse action, which occurred on August 15, 2011, and they were not part of a larger "pattern of

derogatory statements."  *See* Def. 56.1 Statement ¶ 21(2); Pl. 56.1 Statement ¶ 21; Gorman

Decl., Ex. C, at 188-89.  This stands in stark contrast with, for example, the "pattern of

derogatory statements" that were found to support an inference of discrimination in *Abdu-*

*Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456 (2d Cir. 2001), where a decisionmaking manager

"made numerous comments about the age of the [employees], referring to them as

'contaminated' and 'Bad Apples,'" and the comments occurred "against the background of [the

employer's] all-consuming interest in the age and projected retirement rates of the [employees]."

239 F.3d at 468.  Under these circumstances, Defendant Toda's statements about Puerto Ricans

constitute, at most, "the stray remarks of a decision-maker," and "without more, [they] cannot

prove a claim of discrimination."  *Id.*

### iii. Disparate treatment

Plaintiff further argues that an inference of discrimination is raised by Defendant Toda's

"treat[ing Plaintiff] in a discriminatory manner, different from how he treated the other two staff

pharmacists of Asian Descent at the NYSPI," Mr. Jung and Ms. Takami.  Pl. Opp. 10.  Again,

the force of this argument is severely undermined by the absence in the record of any evidence

19

indicating that Defendant Toda participated in the decision to place Plaintiff on administrative leave, other than by forwarding Ms. Takami's complaint to Human Resources.  Even if he had, these allegations would raise no inference of discrimination because Plaintiff was not similarly situated to Ms. Takami or Mr. Jung, who were Plaintiff's subordinates, and who were not alleged to have engaged in comparable conduct.

"A showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a *similarly situated* employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (quoting *Mandell*, 316 F.3d at 379) (emphasis added).  "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'"  *Id.* at 493-94 (quoting *Graham v. Long Island R.R.*, 230 F.3d at 40); *see also Anyanwu*, 2013 WL 5193990, at *14 (disparate treatment requires "a showing that the more favorably treated employees were 'similarly situated' to the plaintiff in all material respects") (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *Ruiz v. Cnty. Of Rockland*, 609 F.3d at 494-95; *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-55 (2d Cir. 2001)).

Ms. Takami and Mr. Jung meet neither of these requirements and cannot serve as comparators for purposes of generating an inference of discrimination.  Ms. Takami and Mr. Jung were not subject to the same performance evaluation and discipline standards as Plaintiff—indeed, Plaintiff was their supervisor. Def. 56.1 Statement ¶ 6.  Nor did Ms. Takami or Mr. Jung engage in comparable conduct.  Conduct is "comparable" if there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," although does not need to be "a showing that both cases are identical."  *Ruiz*, 609 F.3d at 494 (quoting *Graham*

*v. Long Island R.R.*, 230 F.3d at 40).  Mr. Jung is not alleged to have engaged in any misconduct at all, and Ms. Takami resigned after making "two errors in dispensing medication." Pl. Opp. 5. Plaintiff, by contrast, was placed on administrative leave for creating "an uncomfortable work environment" for her subordinates. Def. 56.1 ¶¶ 24-26.  Far from the "reasonably close resemblance of the facts and circumstances" required to show that two people are similarly situated for purposes of disparate treatment analysis, Plaintiff's, Ms. Takami's, and Mr. Jung's respective cases bear no resemblance at all.  Consequently, the alleged disparity in the way in which they were treated by Defendant Toda raises no inference of discrimination.

Plaintiff has failed to raise an inference of discrimination sufficient to make a *prima facie* case under the *McDonnell-Douglas* framework.  Accordingly, defendants' motion for summary judgment is granted on Plaintiff's Title VII, NYSHRL, and NYCHRL claims of national origin discrimination.

### C. Retaliation under Title VII and NYSHRL

Plaintiff alleges that Defendants unlawfully terminated her in retaliation for filing a complaint of discrimination with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC")[2] in violation of Title VII, NYSHRL, and NYCHRL.  The Court begins by considering Plaintiff's NYSHRL and Title VII together, as they are analyzed "in the same manner;" retaliation claims brought under NYCHRL are analyzed "more liberally" and must be considered separately. *See Mingguo Cho v. City of New York*, No. 11-cv-1658, 2012 WL 4376047, at *10 (S.D.N.Y. July 25, 2012) (citing *Dressler*

---

[2] As previously discussed, is some confusion in the record regarding the agency with which the August 24, 2011, discrimination complaint was filed. *See supra n.1.* The Court assumes that the relevant complaint was filed in the NYSDH and EEOC, but also notes that, wherever the complaint was filed, it constituted protected activity for purposes of retaliation under Title VII, NYSHRL, and NYCHRL.

*v. N.Y.C. Dep't of Educ.*, 2012 WL 1038600, at \*12 (S.D.N.Y. Mar. 29, 2012); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).

The burden-shifting *McDonnell Douglas* framework governs retaliation claims as well as discrimination claims. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). Under this framework, Plaintiff initially bears the burden of making out a *prima facie* case of retaliation. If she succeeds, the burden shifts to Defendants to produce a legitimate, nondiscriminatory reason for the adverse action. If Defendant produces such a reason, the burden shifts back to plaintiff to establish, through either direct or circumstantial evidence, that the employer's proffered reason is pretextual, and the action did in fact have an improper retaliatory purpose. *See id.*

### 1. Prima facie case

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d at 79 (internal citation omitted). It is undisputed that Plaintiff has satisfied the first three prongs of this test: (1) she engaged in protected activity by complaining to CPS Human Resources that she was the victim of national origin and gender discrimination and subsequently filing a complaint of discrimination with the NYSDH; (2) Defendants were aware of that activity, *see* Def. Br. 15; and (3) Plaintiff suffered an adverse employment action when she was terminated, *see* Def Br. 15. Only the fourth prong—whether Plaintiff has sufficiently shown a "causal connection" between her NYSDHR complaint and her termination—is contested. *See* Def. Br. 16-17.

22

Plaintiff argues that the timeline and sequence of events sufficiently establishes the "causal connection" between the protected activity and the adverse action. Plaintiff filed a complaint with NYSDHR on August 22, 2011, Gorman Decl., Ex.II, and CPS was informed of this complaint on August 24, 2011, Borelli Decl., Ex. C at 136-38; Ex. E at 289. Approximately one month later, on September 28, 2011, CPS human resources officer Stephanie Wesala informed Plaintiff that, if she did not voluntarily resign, she would be terminated. Borelli Decl., Ex. E at 257. According to Plaintiff, the relatively close proximity between the August 22, 2011, filing of the discrimination complaint and the September 28, 2011 termination provides enough evidence of a causal connection between the two to survive summary judgment.

Defendants counter that Plaintiff's placement on administrative leave over a week before she filed her complaint with the NYSDHR undermines whatever causal connection is established by the sequence of events. *See* Def. Br. 16; Def. 56.1 Statement §§ 24-27. In support of their argument, Defendants draw on cases finding no causal connection where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity." *Deebs v. Alstom Transp. Inc.*, 346 Fed. Appx. 654, 657-58 (2d Cir. 2009) (quoting *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir.2001)). Those cases are inapposite. In *Slattery*, for example, the pattern of gradual adverse job actions leading to the plaintiff's termination began five months before the plaintiff filed charges with the EEOC. *See* 248 F.3d at 95. Here, by contrast, the initial adverse employment action, Plaintiff's placement on administrative leave, occurred just one day before Plaintiff first complained to CPS that she was the victim of unlawful discrimination. *See* Def. Br. 16. Plaintiff's placement on administrative leave is, moreover, the very adverse action that underlies her complaint of discrimination. It

23

would be illogical to penalize Plaintiff for failing to complain of the discriminatory nature of that action before it had even taken place.

Plaintiff has sufficiently established a causal connection to make a *prima facie* case of unlawful retaliation. "In [the Second] Circuit, 'a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (second alteration in original) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The relatively close proximity between the August 22, 2011, filing of the discrimination complaint and the September 28, 2011, termination provides enough evidence of a causal connection between the two to survive summary judgment. *Cf. Henderson v. Center for Community Alternatives*, 911 F. Supp. 689, 702 (S.D.N.Y. 1996) (finding that six-week lapse between the protected activity and the adverse action "could lead a reasonable finder of fact to infer a causal connection").

### 2. Legitimate, non-discriminatory reasons

Because Plaintiff has made a *prima facie* case of retaliation, the burden shifts to Defendants to articulate legitimate, non-discriminatory reasons for the adverse employment action. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d at 81. Defendants have met their burden by attributing the termination to staff complaints regarding Plaintiff's poor interpersonal skills, the poor performance review Plaintiff received in October 2010, the July 2010 letter of reprimand, the results of the investigations of Ms. Takami's complaint against Plaintiff, and Plaintiff's complaint against Defendant Toda, and NYSPI's stated preference that Plaintiff be removed from her position as Director of Pharmacy. Def. Br. 15-16; Def. Reply 8-9.

### 3. Pretext

24

Once a defendant satisfies its burden to articulate legitimate, non-discriminatory reasons for the adverse employment action, the burden shifts back to "persuade the trier of fact that she was the subject of illegal discrimination," *Holtz*, 258 F.3d at 81 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. at 143), which may be accomplished by a showing that the Defendant's articulated reasons is false or pretextual, in combination with an evaluation of the underlying strength of Plaintiff's *prima facie* case, *see Reeves*, 530 U.S. at 147-48. Plaintiff has not met her burden, and no reasonable factfinder could find that CPS's proffered reasons for terminating Plaintiff are pretextual.

Plaintiff is unable to raise substantial factual questions regarding the legitimacy of CPS's proffered reasons for the adverse action, *i.e.* the history of staff complaints regarding Plaintiff's interpersonal skills, the poor performance review Plaintiff received in 2010, the letter of reprimand Plaintiff received in 2010, and NYSPI's stated preference that Plaintiff be removed from her position as Director of Pharmacy. *See* Def. Br. 16-17. It is undisputed that Plaintiff was reprimanded for circumventing the chain of command to discuss staff reductions with outside managers in July 2010, Pl. 56.1 Statement ¶ 13(a), and that Plaintiff received a poor performance review in October 2010, *see* Pl. 56.1 Statement ¶ 15 (disputing only the characterization of the poor performance review as a "further deteriorat[ion]" and raising a question as to whether Defendant Toda participated in its authorship). And while Plaintiff denies the allegations that she in fact possesses poor interpersonal skills, she does not dispute that her interpersonal skills were the subject of multiple staff complaints, including the June 2009 incident in which the entire pharmacy staff met with Plaintiff's on-site supervisor at NYSPI to complain about Plaintiff's interpersonal skills, *see* Gorman Decl., Ex. F, at 43-45; Ex. C, at 69; Pl. 56.1 Statement ¶ 9(b), at 2-3, and the August 2011 email from Ms. Takami, *see* Pl. 56.1

25

Statement ¶ 24 (not disputing that Ms. Takami's email claimed that her resignation "was prompted by Plaintiff's creation of an uncomfortable work environment").

Perhaps most significantly, Plaintiff does not contest that NYSPI specifically requested that Plaintiff be removed from her position as Director of Pharmacy, and she does not allege that NYSPI's opposition to her was motivated by discriminatory animus or retaliatory intent. *See* Pl. 56.1 Statement ¶ 34. That retaining Plaintiff as the Director of Pharmacy at the NYSPI site would, as Plaintiff points out in her 56.1 Counterstatement of Facts, have required CPS to "stake[] their reputation" on Plaintiff tends to *confirm* rather than undermine the legitimacy of CPS's decision. *Id.* Even viewing the record in the light most favorable to Plaintiff, no reasonable factfinder could find that it shows CPS's decision to terminate Plaintiff to be pretextual.

Also unpersuasive is Plaintiff's argument that CPS's failure to follow their progressive discipline policy demonstrates pretext. Pl.Opp. 13. Plaintiff's claim that she was terminated without first having been "issued a verbal nor written warning concerning talking behind people's backs, or calling people names," *id.*, totally elides the undisputed fact that, in June 2009, the entire staff of the pharmacy met with Dr. Lowenthal to complain that Plaintiff talked about them behind their backs and called them names, and that *Dr. Lowenthal discussed his concerns with Plaintiff afterwards*. Def. Exh. C, at 66-70. In light of this June 2009 meeting with her NYSPI on-site supervisor, the absence of a written warning from CPS human services cannot show, as Plaintiff alleges, that she was "terminate[d]. . . with no prior corrective action." Pl. Opp. 14.

Nor does the fact that CPS failed to place Defendant Toda on administrative leave following Plaintiff's complaint against him raise a sufficient inference of pretext to defeat

26

summary judgment.  In this context, the Court understands Plaintiff to be making a kind of "disparate treatment" argument, *i.e.*, Plaintiff argues that, during the pendency of the investigation against her, CPS treated her less favorably than it treated Defendant Toda, which suggests that her treatment had an improper retaliatory purpose. *See, e.g., Barney v. Consolidated Edison Co. of N.Y.*, 391 Fed. Appx. 993, 996 (2d Cir. 2010) (addressing Plaintiff's argument that "disparate treatment is probative that [employer's] articulated non-retaliatory reason for her termination was pretextual").  As in the discrimination context, however, a showing of disparate treatment suggests improper motive only when the Plaintiff is "similarly situated" to the comparator. *See id.  Cf. Ruiz v. Cnty. of Rockland*, 609 F.3d at 493.  "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz*, 609 F.3d at 493-94 (quoting *Graham v. Long Island R.R.*, 230 F.3d at 40).

Plaintiff and Defendant Toda were not similarly situated: they were not subject to the same performance evaluation and discipline standards, nor were they investigated for "comparable conduct."  While it is true that both were investigated for allegedly mistreating their subordinates, the allegations against Plaintiff were significantly different in that they involved subordinates she directly supervised in the course of their daily work responsibilities, with whom she would inevitably interact during the pendency of the investigation. *Cf.* Def. 56.1 Statement ¶ 6 (Plaintiff's job duties) *with id.* ¶ 5 (Plaintiff's CPS supervisor's job duties).  Defendant Toda, by contrast, encountered Plaintiff relatively infrequently in the course of his ordinary work— they met a total of five or six times during the period in which he was her supervisor. Def. 56.1 Statement ¶ 21.  That Plaintiff had already been placed on administrative leave, moreover, guaranteed that Defendant Toda would not interact with her during the pendency of the

27

investigation against him.  Def. Reply 4.  Because Plaintiff and Defendant Toda were not similarly situated, the differences in their treatment while under investigation do not constitute evidence that CPS's proffered reasons for terminating Plaintiff are pretextual.

Plaintiff has failed to show that a reasonable factfinder could find that she was the subject of unlawful retaliation, and Defendants' motion for summary judgment is granted with respect to her Title VII and NYSHRL retaliation claims.

D. Retaliation under  NYCHRL

Like claims brought under Title VII and NYSHRL, retaliation claims brought under NYCHRL are evaluated according to the three-step burden-shifting framework established in *McDonnell Douglas*. *See White v. Pacifica Found.*, 2013 WL 5288851, at *17 (S.D.N.Y. Sept. 19, 2013).  The standard for establishing unlawful retaliation under NYCHRL is, however, broader than under Title VII or NYSHRL in that "a plaintiff need not establish that an adverse action was materially adverse. She need only establish that the action was 'reasonably likely to deter a person from engaging in a protected activity.'"  *Costello v. N.Y. State Nurses Ass'n*, 783 F.Supp.2d 656, 676 (S.D.N.Y. 2011) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 70–71, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).  Under these circumstances, however, the broader NYCHRL standard makes no difference.  Plaintiff's Title VII and NYSHRL retaliation claims failed because Plaintiff was unable to establish pretext under the *McDonnell Douglas* standard, not because she was unable to show that she suffered a sufficiently material adverse action.  Accordingly, Defendants' motion for summary judgment as to plaintiff's retaliation claims under the NYCHRL is granted.

E. Gender and gender-plus discrimination and harassment under NYSHRL and
NYCHRL

Plaintiff alleges that she was subjected to gender and gender-plus discrimination, presumably on the basis of her status as a pregnant woman, in violation of NYSHRL and NYCHRL, as well as gender-based harassment in violation of NYCHRL. Am. Compl, Gorman Decl., Ex. A ¶¶ 69-75, 76-82, 83-89, 90-96. The standard for evaluating NYSHRL discrimination claims is the same as that for Title VII. *See Dawson v. Bumble & Bumble*, 398 F.3d at 217. For NYCHRL claims, "the primary issue for a trier of fact in [both discrimination and harassment claims] is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Williams v. N.Y.C. Housing Authority*, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009).

The record, however, is utterly devoid of evidence that Plaintiff was discriminated against on the basis of her gender or her pregnancy. Plaintiff was permitted to take her full twelve weeks of FMLA leave, and she was thereafter permitted to return to her position as Director of Pharmacy. Def. 56.1 Statement ¶ 22. As Plaintiff herself testified, neither Defendant Toda nor any other CPS employee ever made any derogatory comments regarding her sex or gender. Def. Br. 8; Gorman Decl., Ex. C, at 228, 281. Plaintiff's allegations that "Defendant Toda treated Plaintiff in a derogatory manner, and treated the staff pharmacists which were of Asian descent better than he treated her" are irrelevant to her claim of pregnancy and sex-based discrimination and create no issue of material of fact on this point. *See* Pl. Opp. 20; Pl. 56.1 Statement ¶ 22. In fact, Plaintiff's allegation that Defendant Toda treated Ms. Takami better than he treated Plaintiff tends to disprove rather than prove Plaintiff's claim of gender discrimination, as Ms. Takami is also a woman.

Plaintiff, moreover, cannot allege that she suffered an adverse employment action on account of her gender or her pregnancy that was sufficiently material to state a claim under

29

NYSHRL.  For purposes of NYSHRL (like Title VII), "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Anywanwu*, 2013 WL 5193990, at \*20 (quoting *Galabya v. N.Y. City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  A materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*  The allegation that Plaintiff's then-supervisor, Mr. Fingers, "expressed dismay toward Plaintiff" when he learned that she would be taking her pregnancy leave earlier than anticipated does not constitute an adverse employment action under this standard; nor does the fact that Plaintiff was forced to "use her vacation days in order to accommodate the few days leading up to her delivery date." Pl. Opp. 18.

While the NYCHRL does not require plaintiffs to show that they were subject to a material adverse employment action, it is not intended to constitute a "general civility code." *Williams*, 872 N.Y.S.2d at 40-41 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)).  Defendants are thus provided with an "affirmative defense whereby [they] can avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 41.  That standard being easily met in this case, no reasonable finder of fact could find that Plaintiff has made a *prima facie* case of gender or gender-plus discrimination or harassment under NYCHRL.

Having failed to show that she was treated "less well" than other employees "because of her gender" or pregnancy—let alone that she was the subject of a materially adverse employment action because of her gender or pregnancy—Plaintiff has failed to make a *prima facie* case of gender discrimination under either NYSHRL or NYCHRL. *Williams*, 872 N.Y.S.2d at 39.

Accordingly, the motion for summary judgment is granted with respect to Plaintiff's gender and gender-plus discrimination claims brought under NYSHRL and NYCHRL.

### F. Individual liability under NYSHRL, NYCHRL

Having granted Defendant's motion for summary judgment on all Plaintiff's national origin, gender, and gender-plus discrimination and retaliation claims brought under NYSHRL and NYCHRL, the question of Defendant Toda's individual liability need not be reached.

But even if Plaintiff's NYSHRL and NYCHRL claims had survived summary judgment, individual liability would be inappropriate in this case. Under NYSHRL, "an individual may be liable for discrimination if [he] was an 'employer,' but only 'individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees' are considered employers." *Anywanwu*, 2013 WL 5193990, at *22 (quoting *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365-66 (S.D.N.Y. 2012) (Oetken, J.)). In addition, an individual employee may be liable under the "aiding-and-abetting provision" of NYSHRL § 296(6) and NYCHRL "if he or she 'actually participate[d] in the conduct giving rise to the discrimination.'" *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004)) (alteration in original).

There is no evidence in the record that Defendant Toda had the hiring-and-firing authority or personal ownership stake necessary to meet the definition of "employer" under NYSHRL. Nor is there any evidence in the record that Defendant Toda participated directly in the decision to place Plaintiff on administrative leave, *see supra* § III.C.2, or the decision to terminate her, *see* Def. 56.1 Statement ¶ 38; Pl. 56.1 Statement ¶ 56.1(b) (failing to dispute the assertion that Defendant Toda had no role in the decision to terminate plaintiff). Thus, even if Plaintiff had been able to show that those actions were discriminatory in nature, Defendant Toda would not be individually liable under NYSHRL or NYCHRL.

31

**CONCLUSION**

For the foregoing reasons, summary judgment is GRANTED on Plaintiff's Title VII, NYSHRL, and NYCHRL claims against Defendants. The Clerk of Court is requested to terminate this case.

SO ORDERED.

Dated: November 19, 2013

New York, New York

ALISON J. NATHAN

United States District Judge